AGUSTÍN HERNÁNDEZ-MENA, Plaintiff and Appellant, v. BERNARDO LECUMBERRI, Defendant and Appellee.

No. 4039. Argued January 13, 1927.—Decided March 11, 1927.

**358**

*Salvador Mestre* for the appellant. *Monserrat & Monserrat* for the appellee.

Mr. Justice Hutchison delivered the opinion of the court.

In August, 1922, Domingo Rullán sold to Ruperto Fuentes a house and lot in Santurce for $8,000, $5,000 of which were acknowledged by the vendor to have been received from the purchaser and $3,000 of which were retained by Fuentes in order to meet an outstanding obligation secured by a mortgage for the amount last mentioned, together with the interest thereon at 12 per cent per annum and an additional sum of $280 to cover costs and attorneys' fees. This mortgage had been executed in September, 1921, in favor of Jesús Sánchez González, who, in January, 1923, instituted a summary foreclosure proceeding for the recovery of the amounts above mentioned, for $120, interest due on December 12, 1922, together with interest at the specified rate from and after that date until paid and an additional sum of $13.89 as reimbursement of a premium paid by plaintiff upon a fire insurance policy. At this time the property was also subject

to the liens of subsequent mortgages and attachments levied by other creditors of Fuentes amounting in the aggregate to $4,991, all of which were recorded in the registry of property.

On the 17th and 18th of January the demand for payment was served on Fuentes and on the junior encumbrancers, none of whom appeared in the proceeding.

On February 26th plaintiff moved for, and, on the day following, obtained a judgment ordering the attachment and sale of the mortgaged premises.

On March 13th Agustín Hernández Mena filed a motion, in accordance with the provisions of articles 129 of the Mortgage Law and 175 of the Regulations, setting forth the conveyance by Rullán to Fuentes and a subsequent transfer of the mortgaged premises by Fuentes to Hernández on January 22nd, 1923, and requesting that the name of Hernández be substituted for that of Fuentes in the foreclosure proceeding. A copy of the deed last referred to was mentioned in the motion as attached thereto, but there was no intimation that the conveyance included anything more than the house and lot, although the motion did contain a full description of the said house and lot as the property sold by Rullán to Fuentes, by Fuentes to Hernández and identical with that described in the petition for foreclosure of the mortgage. This elaborate description of the property sold by Fuentes to Hernández being a *verbatim* copy of that found in the mortgage was not calculated to draw the attention of the court or of counsel for the mortgagee to coming events but faintly foreshadowed, if at all, by other matters contained in the deed, and conspicuous only by reason of their absence in so far as the motion itself was concerned.

Here Hernández, if a *bona fide* purchaser, seems to have overlooked an excellent opportunity to raise and to demand a determination of the questions hereinafter to be discussed.

On March 16th the motion of Hernández was granted, his

name was substituted for that of Fuentes in the foreclosure proceeding and the notification of such substitution to the marshal was ordered.

It does not appear that Hernández was a bidder although present at the sale, during the progress of which a brief colloquy occurred wherein the marshal inquired: "What are you going to do, Don Agustín?" and Hernández replied, "I am waiting to see whether there is anything left."

Bernardo Lecumberri was the successful bidder and obtained the property sold by the marshal for $3,600, but upon investigation Fuentes was found to be in possession. Thereupon Lecumberri instituted a proceeding for unlawful detainer against Fuentes.

Fuentes again defaulted and Hernández reappeared with a motion for leave to intervene upon grounds stated as follows:

"First:—That by deed No. 3, executed on January 22, 1923, before Manuel Tous Soto, notary of this city, petitioner bought from Ruperto Fuentes y Fuentes, defendant in this unlawful detainer proceeding, the urban property described as follows: (a)—URBAN, a house and lot in the northern section of the ward of Santurce of this city. The house is a one-story building, of reënforced concrete roofed with bricks; the lot measures 14 meters 74 centimeters on the west, in front on Church Street; 36 meters 72 centimeters on the north, to the left adjoining a lot and house belonging to Mr. Eduardo Fenlong; 35 meters 43 centimeters on the east, in the rear adjoining a lot of Mr. Julián Matienzo; and 20 meters 80 centimeters on the south, to the right where the wing of the house is located, bounding a lot of Mr. Pedro Orcasitas; 22 meters 2 centimeters—the bend of the wing—bounding lot of Francisco Furnis. (b)—A frame dwelling-house, with a balcony, roofed with galvanized iron, 7 varas long and 4 varas wide more or less, bounded on the front, south, east and west, by the lot on which it stands. (c)—A frame garage for keeping two big trucks, roofed with zinc, having a frontage of 6 varas and a depth of 7 varas more or less. (d)—A chicken-house, made of wooden beams covered with mesh wire.

"Second:—That the real properties hereinbefore described under letters (b), (c) and (d) are located on the lot described under (a),

on which the reënforced concrete house above described is also located, Plaintiff Bernardo Lecumberri claims to be the owner.

"Third:—The petitioner sets forth that the deed of conveyance of the real properties described in the first averment of this motion was and is at present recorded in the Registry of Property, as to the properties described under (a), (b) and (c), at page 50 of volume 76 of Northern Santurce, property No. 2335, fourteenth entry.

"Fourth:—The petitioner alleges that at present he is the absolute owner of the properties described under (b), (c) and (d) in the first averment of this motion; and that for this strong reason he has interest in the unlawful detainer proceeding herein, and wishes to become a party together with defendant Ruperto Fuentes."

The house and lot described under the letter "a" is the property described in the mortgage, in the foreclosure proceeding and in the action for unlawful detainer.

Neither Hernández nor Fuentes appeared at the preliminary hearing in the proceeding last mentioned and upon the evidence adduced by plaintiff Lecumberri, judgment was rendered in accordance with the prayer of the complaint.

Upon the arrival of Lecumberri accompanied by the marshal with a writ of possession Fuentes was not to be found, but a key to the concrete house was obtained from a street vendor who was evicted from the house described as a frame-dwelling by Hernández in his motion for leave to intervene as a defendant in the unlawful detainer proceeding.

Hernández now appeals from an adverse judgment in a so-called revendicatory action and insists that:

"The court erred in dismissing the complaint, stating that the only thing to which plaintiff was entitled was to claim the amount of the value of the property to which he refers, to request that from the proceeds of the sale at public auction of the property the amount of the value of the properties located on said lot be delivered to him, if deemed to be accessions to the land, taking into account their nature and their use with respect to the principal property.

"The court erred in holding that it was proper to consider whether

the plaintiff may allege that he is a third party possessing the property, applying in that regard the case of *Valdecilla* v. *Auffant,* 1 D.P.R. 302.

"The court erred in finding that plaintiff is not within the provisions of section 112 because the new structures were not built at his expense."

The prayer of the complaint was not for a restoration of the possession of any part of the property claimed by Hernández nor was it for a judicial authorization of a contemplated removal of such property by plaintiff, nor was it for a judicial sale of such property and for the delivery of the proceeds thereof to plaintiff. It was in substance a demand that plaintiff should be declared to be the owner of the properties already described under the letters *b, c* and *d* in the motion for leave to intervene, *supra,* and in consequence thereof that the defendant Lecumberri should be compelled to pay the sum of $1,500 to plaintiff as damages, together with costs and attorneys' fees.

Articles 110 to 113, inclusive, of the Mortgage Law and article 162 of the Regulations for the enforcement thereof read as follows:

"Art. 110. A mortgage extends to natural accessions, improvements, pending fruits and rents not collected at the time of the maturity of the obligation, and to the value of the indemnities granted or due the owner by the underwriters of the property mortgaged, or by virtue of condemnation for purposes of public utility.

"Art. 111. In accordance with the provisions of the preceding article, the following shall be considered to have been mortgaged jointly with the estate, even though not mentioned in the contract, provided they belong to the owner thereof:

"1. Movable objects permanently attached to a building, either for its adornment or purposes of comfort, or for the service of some industry, even though it shall have been attached after the mortgage was constituted.

"2. Improvements consisting of new plantings, works of irrigation or drainage, repairs, safety devices, changes, conveniences, adornment or heightening of buildings, and any other similar works

not consisting of the addition of lands, excepting by natural accession, or of the construction of new buildings where none formerly existed.

"3. The products, which at the time the mortgage obligation matures may be growing upon the trees or plants, or which have already been harvested, but not yet removed or stored.

"4. Due and unpaid rents, whatever be the cause of their not having been collected, and those payable until the creditor shall have recovered his full claim.

"5. The indemnities granted or due the owner of the real property mortgaged either for the insurance thereof or of the fruits, provided the disaster shall have occurred after the constitution of the mortgage, or on account of the condemnation of the lands for causes of public utility.

"Art. 112.   When the estate mortgaged shall pass into the hands of a third person, the mortgage shall not extend to the movable property permanently attached to the buildings, nor to the improvements which do not consist of works of repair, safety or transformation, provided that either shall have been paid for by the new owner, nor to the pending fruits and rents due which may belong to him.

"If any portion of the ground of an estate encumbered by previous mortgages shall pass into the hands of a third person, and it appears from the register that it contains no machinery, movables, objects or constructions of any kind, said portion of land shall continue subject to the previous mortgages on the estate; but the third holder may withdraw whenever he deems it advisable, any machinery, object, movable or construction he may have brought or made there, as the case may be, judicial claims as to such additions being forbidden, and it not being lawful when the estate and the portion sold shall be attached or sold by other prior recorded creditors, to demand the retention of such additions, whatever be their class. Notice of the record of the sale shall be served on prior mortgage creditors.

"Art. 113.   The owner of the accessions or improvements which are not considered mortgaged according to the provisions of the first paragraph of the preceding article, may demand the value thereof or retain the objects of which they consist, if this can be done without depreciating the value of the remainder of the estate; but in the former case he can not delay the performance of the principal obligation under the pretext of enforcing his right, but he will be obliged

to recover his claim from the price of the estate, when it shall be alienated for the payment of the credit."

"Art. 162. The owner of the accessions and improvements which are not considered mortgaged, in accordance with the provisions of the first paragraph of article 112 of the law, who shall elect to receive the amount thereof, according to article 113 even in the case of the alienation of the estate, shall be paid in full from the proceeds of the sale thereof, although the balance remaining shall not be sufficient to cover the mortgage claim. But if the accessions or improvements may be removed without damage to the estate, and notwithstanding this fact the owner should elect not to take them, they shall be sold apart from the estate, and only the price received therefor shall be turned over to the owner."

Counsel for appellee quotes Morell, *Legislación Hipotecaria,* Vol. 3, page 711, as follows:

"Then, if the improvements to which the third holder is entitled may be removed without detriment to the property, he may retain them in his possession, or he may be content with the separate sale thereof and receipt of the proceeds. If the property would be damaged by the removal of the improvements, the latter should be sold with it, and the value of such improvements be paid in full from the proceeds of the sale, the balance even if not sufficient, to be applied on the mortgage claim. To the end that this provision of sections 113 and 187 of the Regulations (equivalent to section 162 of Porto Rico) may prove less unjust, we think that the improvements should be estimated separately from the property and that the holder should receive not what they cost but what they are worth at the time.

"The general trend of the law does not militate against this conclusion. It gives to the possessor only the right to demand the amount of the improvements, that is, their value, and the Regulations say only that he shall be credited with what is due him. The courts will order what they deem to be just, without prejudice to the right to sell the property together with the improvements as a unit, as the appraisal of such improvements should be for the sole purpose of delivering the value thereof to the owner or third possessor."

This is followed by an extract from *Derecho Hipotecario y Notarial* by Barrachina, Vol. 3, page 11, which reads thus:

"The owner of the accessions or improvements, not deemed to be mortgaged, provided always that he be a third person, may demand, the value thereof or retain them. This last may be done only when the retention does not depreciate the value of the property.

"Thus the *jus retentionis* is applicable to the movable property permanently attached to the buildings and to the improvements consisting of works of repair, safety and transformation. With regard to the movable property incidentally found on the premises or property which does not permanently form part of the building, as for example the windowblinds, the third person is entitled to something more than the *jus retentionis:* The right to remove them inasmuch as the mortgage does not cover such things. With reference then, to those accessions and improvements which are not considered mortgaged, the law grants two rights to the third holder: First, to demand the value thereof; second, to retain the things themselves, if the value of the property is not thereby depreciated. Although it is superfluous to say so, this means that if depreciation results there is no such right of retention, the third person being entitled only to demand the value. However, this, given the nature of the hypothecary action which can not be interrupted, does not authorize said third person to impede fulfilment of the principal obligation, under the pretext of enforcing his right. Whether ordinary or summary, the judicial proceeding ought to continue its course, and when the time comes to distribute the proceeds obtained, the third person will get the amount belonging to him from the proceeds of the sale of the property, at the same time that the mortgage is paid.

"It follows that the law contemplates; on one hand, the enforcement of the right of the mortgage creditor, so that its exercise may not be impaired by any claim of the third party for the accessions and improvements which, though effected on the property, are not covered by the mortgage; and on the other, an equitable adjustment of the interests of both parties concerned.

"Who shall recover first, the third party or the mortgage creditor? The answer to this is found in section 97 of the Regulations which, though promulgated for the Law of 1869, may be applied to the present law, for there is no discrepancy as to the point in issue, thus: 'If the accessions and improvements cannot be separated, such third party will recover everything due him from the proceeds of the sale of the property, even though the remainder may not be sufficient to cover the mortgage.' "

Galindo and Escosura, Vol. 3, page 332, paraphrase the law somewhat more briefly, in this way:

"If the accessions and improvements can be separated without detriment to the property, the third party may either take them away or leave them. In the latter instance, they will be alienated independently of the property, and the proceeds will be delivered to him (sec. 96 Reg.) ; and he may dispose of them as he pleases in case that they are not sold. If they can not be separated without detriment to the property, there is no right of election in the third party, and he is only entitled to recover their amount from the proceeds of the sale of the mortgaged property, without being entitled to delay the fulfilment of the principal obligation. (Sec. 113 of the Law.)"

We quite agree with appellant that whatever right, title or interest Fuentes had in the property now in controversy passed to his vendee and that Hernández from and after the date of such transfer stood in the shoes of Fuentes. But we can not concur in the view that the structures in question amounted to "the new construction of buildings, where previously none existed" or that they were shown to have been constructed by Fuentes.

It is true that a recital in the deed executed by Fuentes refers to the so-called frame dwelling, to the garage and to the chicken house as newly constructed. But the statement does not exclude the hypothesis of construction by Rullán before his conveyance to Fuentes some five months prior to the purchase by Hernández. In so far as the "frame dwelling" is concerned the theory of appellant is practically exploded by the testimony of a carpenter who examined the "buildings" in question, appraised them and stated as a witness for plaintiff that the "dwelling" showed signs of age and deterioration at the time of such inspection.

Plaintiff seems to have been content to rest the question of construction upon the recital contained in his deed, perhaps upon the theory of the proverbial phrase "It is better to leave well enough alone." It is only on cross-examination

that Hernández first makes the conservative statement that his vendor had assured him and had stated in the deed that the houses in question were constructed after the date of the mortgage. And it is only under the pressure of further cross-examination that this witness states upon information, said to have been received from Fuentes, that the "buildings" were constructed by Fuentes.

Manifestly it would not lie in the mouth of the defendant to complain if the court below had accepted these hearsay statements as establishing the fact of construction by Fuentes. But the trial judge was not obliged to believe either that Fuentes made the statements imputed to him by Hernández or that such statements, if made by Fuentes, were true. The court below therefore did not err in failing to find that the improvements or "buildings," as the case may be, were erected by Fuentes, or in ignoring the evidence upon this point and finding simply, as it did, that the work in question was not done by Hernández.

The character of the chicken house and of the garage as mere improvements or appurtenances is hardly open to question. The chicken house was well filled with poultry belonging to Fuentes at the time it was sold, together with its contents, to Hernández. The garage was used by Fuentes during the time of his residence in the concrete building as the owner thereof and, beyond the curious suggestion contained in the deed of conveyance to Hernández, there is nothing whatever to indicate any other or different use at any time. A chicken house in the back yard of a suburban residence could hardly be converted into a "building" within the meaning of subdivision 2 of article 111, *supra,* by the simple device of describing it in a deed of conveyance as intended, say, for the shelter of ostriches. Nor do we perceive how a like reference to an ordinary garage similarly situated designating it as designed for the housing of "two big

trucks,'' can operate any more effectively as a magnifying medium.

The case of the ''frame dwelling'' is somewhat more doubtful. There was some evidence tending to show that for several months before and after the conveyance to Hernández this ''building'' was occupied by a street vendor of vegetables. This tenant divided the one-room house by a partition and installed therein a charcoal stove and a water closet seat. There is no testimony as to the manner in which this one-room structure was used prior to its occupancy by the vegetable vendor. Nevertheless, the size of the building, its immediate proximity to the concrete dwelling, its location in the rear of the larger house and the total absence of anything to indicate an original purpose of independent use, all point more or less conclusively to the ordinary washroom or servants' quarters usually found adjacent to suburban residences in Santurce.

Appellant's only business aside from his status as a property owner has to do with matters involving questions of law (cuestiones de abogado). In the instant case he paid $3,500 in cash and in the presence of the notary for the real estate acquired by him from Fuentes. Of this amount $500 was for the property now in controversy and $3,000 represented the purchase price of the house and lot. Appellant did this with his eyes open, with full knowledge of recorded mortgages and other liens upon the property so acquired, in an aggregate approximating $8,000, that is to say, the total amount of the purchase price involved in the previous sale to Fuentes. Hernández then permitted this same property or at least the house and lot to be sold at public auction for the sum of $3,600 and free from all incumbrances to defendant herein, Lecumberri.

Thus it is that the unvarnished truth sometimes seems ''stranger than fiction.'' The most charitable view that can be taken of the resulting situation is that Hernández, to quote

the author of Poor Richard's Almanac, appears to have "paid too much for his whistle."

The error, if any, involved in the reference by the trial judge, made incidentally and by way of after-thought, to the case of *Valdecilla* v. *Auffant* was harmless.

The judgment appealed from must be affirmed.